# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| **vs.** : | **5:04CR44 (DF)** |
| : | |
| **DERRICK DUJUANA HUNT** : | |
| **and ANTONIO SHERARD** : | |
| **SMITH** : | |

## O R D E R

Following their convictions for possession of cocaine with intent to distribute, and for conspiracy to possess cocaine with intent to distribute, Defendants Antonio Sherard Smith and Derrick Dujuana Hunt each timely moved for a judgment of acquittal (docs 77 & 79, respectively), or, in the alternative, for a new trial (docs 76 & 78, respectively). *See* Fed. R. Crim. P. 29 & 33 (West 2005). In addition, Smith has filed a motion for release from custody pending sentencing under 18 U.S.C.A. § 3143(a)(2) (doc 93).

The Court has given full consideration to the defendants' motions, the Government's responses, the complete trial transcript, and the law relevant to the issues presented. For the reasons stated below, the defendants' motions for judgment of acquittal are denied; their motions for new trial are granted; and Smith's motion for release from custody pending sentencing is moot.

## I.    BACKGROUND

Viewing the evidence and all reasonable inferences in the light most favorable to the Government, as the Court is required to do, *see* **United States v. Grigsby**, 111 F.3d 806, 833 (11th Cir. 1997), the relevant facts are as follows. Around 3:00 p.m. on April 8, 2004, Anthony Lamont Dean drove to a car wash known as Water Flow located in Macon, Georgia, where he had worked part time for two to three years. Earlier in the day, Dean had called the car wash to tell Derrick Hunt, a co-worker, that he was coming by to speak with him. Dean wanted to see if Hunt would help him repair a door at his house that had been damaged in an attempted burglary. He also needed someone to help him "re-rock some cocaine."[1] Dean could not re-rock the cocaine by himself because he suffered from a back injury and had undergone disc-fusion surgery, which made it hard for him to get around and required him to walk with a cane. Dean wanted

---

[1] Re-rocking is a process by which powder cocaine is readied for sale on the street. It occurs after the cocaine has been mixed together with a cutting agent (*i.e.* a filler material), which is added to increase the overall quantity of the drug, thereby maximizing the profits to be made on resale. Through re-rocking—the purpose of which is to satisfy the preferences of the discriminating drug purchaser—the cocaine and the cutting agent become a finely ground, tightly compressed mixture. If the re-rocking is successful, the purchaser cannot tell that his cocaine has been adulterated. Dean testified that the cocaine seized in this case had been cut with Mannitol, a powdery white sugar substitute that, when taken in sufficient doses, has a laxative effect.

the cocaine re-rocked that afternoon because he had been contacted by someone[2] who hoped to make a purchase later in the evening.

By the time Dean got to Water Flow, Hunt was working on a stereo and was not available to help him.  However, Antonio Smith—another acquaintance of Dean's—was at the shop and was not busy.  Dean told Smith what he needed help doing, and Smith agreed to lend him a hand.  The two of them drove to Dean's house in the Lake Wildwood subdivision.  While on the way, they discussed the prospect of Dean setting Smith up in the cocaine-selling business.  Dean offered to measure and weigh the cocaine to ensure that Smith received accurate profits from each sale.

When the two arrived at Dean's house, Dean showed Smith the device used to re-rock the cocaine.  The device—referred to at trial as both a "jack" and a "heavy mixer"[3]—was a three-foot-tall, homemade contraption consisting of a barrel built onto a compression-type mechanism.  After showing him the jack, Dean asked Smith to take measurements of the door while Dean began breaking down the cocaine and crushing it into smaller pieces.  When Smith was finished

---

[2] Unfortunately for Dean and company, that someone turned out to be a cooperating witness working with the Bibb County, Georgia Sheriff's Department.

[3] For consistency's sake, the Court will refer to it as a "jack."

taking measurements, he went over and sat down at the table with Dean as Dean continued to crumble up the cocaine.  Dean then asked Smith to cut the corners off of some plastic sandwich bags so that the cocaine could be sorted out and placed into the bags for the convenience of Dean's customer.  According to Dean, Smith cut up enough plastic bags to hold the quantity of cocaine needed for the transaction on April 8.

After a while, Dean and Smith traveled to Lowe's Home Improvement Center to buy some boards with which to repair Dean's damaged front door.  The two then drove back to Water Flow to cut the boards using a Skilsaw kept in the back office.  When the wood was cut, Dean, Smith, and Hunt—who was now available to help—went back to Dean's house.  On the way, they returned to Lowe's to purchase a safe and stopped off at a convenience store to pick up a six-pack of beer.

When they arrived at Dean's house, Dean familiarized Hunt with the jack and then proceeded to mix the cocaine (approximately 500 grams) and the Mannitol (approximately 250 grams) together at his kitchen table.  Dean used a flour sifter to crumble up the cocaine, grind it together, and shuffle it back and forth.  Meanwhile, Hunt and Smith worked on repairing the door.

4

Once he finished adding the Mannitol to the cocaine, Dean wrapped the mixture in aluminum foil to prepare it for the re-rocking process. Hunt and Smith re-rocked the cocaine using the jack because Dean's back problems prevented him from doing so. According to Dean, the cocaine had to be re-rocked about three times to get it just right, and Hunt and Smith operated the jack each time. Once the proper quantity of cocaine had been prepared, Dean, using the plastic sandwich bags cut by Smith, packaged the drugs in nine separate one-ounce bags. He also put several 8 balls into a false-bottom Gunk can.[4] While the cocaine was being packaged, Smith and Hunt sat at the kitchen table drinking beer.

During this time, the cooperating witness made repeated phone calls to Dean. According to Dean, the caller sounded like he was in a hurry, causing Dean, Smith, and Hunt to rush to get the cocaine ready for delivery. Dean testified that he gave Hunt about $25 worth of leftover cocaine as payment for helping him out with the door and with the re-rocking. Dean then asked Hunt to carry the Gunk can to Dean's car, a Mittsubishi Montero, and shove it up under the seat. Hunt did so. Dean did not give Smith anything for his assistance because, as they had discussed earlier, he was going to set Smith up in the business of selling cocaine for himself.

---

[4] An 8 ball is a quantity of cocaine so named for its weight: 1/8 ounce. The term "Gunk" is a trademark for a cleaning solvent.

The three then got into Dean's Montero and drove to the back of a local Buffalo's restaurant, where the transaction was set to occur. Dean drove the car while Smith sat in the front passenger seat and Hunt sat in the backseat on the passenger's side. As the Montero pulled up, law enforcement officials with the Bibb County, Georgia Sheriff's Department surrounded it and told the occupants to get out with their hands up. When Dean stepped out of the vehicle, a Ziploc bag containing nine individually packaged one-ounce bags of cocaine fell to the ground from underneath his shirt. Approximately one gram of cocaine was found on the back floorboard of the vehicle in the vicinity of Hunt's feet. The Gunk can, containing eleven individually wrapped packages of cocaine, was retrieved from underneath one of the seats. After being arrested and read his *Miranda* rights, Dean consented to a search of his home. Dean told law enforcement officials that he had about the same amount of cocaine there as he had in the car.

During the search of Dean's home, investigators found a large number of plastic bags like those recovered from the vehicle, a set of scales, roughly a pound of powder cocaine in Dean's safe, some marijuana concealed in the top of a clock, and a number of firearms scattered throughout the rest of the house.

Dean, Smith, and Hunt were charged in a three-count indictment. Count I charged all three defendants with conspiracy to possess with the intent to distribute cocaine in an amount in excess of 500 grams, in violation of 21 U.S.C.A. § 846. Count II charged all three defendants with possession with the intent to distribute cocaine in an amount in excess of 500 grams, in violation of 21 U.S.C.A. § 841(a)(1). Count III charged Dean, a convicted felon, with possession of a firearm, in violation of 18 U.S.C.A. § 922(g)(1).

On August 2, 2004, Dean pleaded guilty to Counts II and III of the indictment. As part of his plea, Dean agreed to cooperate fully and truthfully with law enforcement officials in the investigation and potential prosecution of any individuals charged in the indictment. Smith and Hunt pleaded not guilty to the charges against them and proceeded to trial. At trial, Smith and Hunt presented no evidence and neither one of them took the stand to testify. On April 21, 2005, a jury convicted Smith and Hunt of the crimes charged in Counts I and II of the indictment. Their post-trial motions were timely filed.

Smith and Hunt offer virtually identical arguments in support of their motions. Both argue that: (1) the Court improperly excluded certain extrinsic impeachment evidence; (2) the Government failed to produce sufficient evidence

to prove beyond a reasonable doubt that they were part of a conspiracy under 21 U.S.C.A. § 846; (3) the testimony of the Government's central witness—co-conspirator Dean—was so thoroughly impeached that the jury erred in relying on it; and that (4) the prosecutor improperly referred during closing arguments to the their failure to testify at trial.  In addition, Hunt separately argues that (5) the prosecutor impermissibly commented during closing arguments on his post-arrest, post-Miranda silence, in violation of his Due Process rights.

## II.    DISCUSSION

### A.    Motion for Judgment of Acquittal

The Court's consideration of a motion for a judgment of acquittal is governed by Rule 29 of the Federal Rules of Criminal Procedure.  Under that Rule, a judgment of acquittal must be entered if the evidence presented by the Government "is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a) (West 2005).  As the text of the Rule indicates, and as courts and other authorities have recognized, "[t]he sole ground for a post-trial motion under Rule 29(c) is that the evidence was insufficient to sustain a conviction."  *United States v. Miranda*, No. 04-15920, 2005 WL 2217071 (11th Cir. Sept. 14, 2005) (quoting *United States v. Fozo*, 904 F.2d 1166, 1171 (7th Cir. 1990)); *see also* Wright, 2A *Fed. Prac. & Proc.*

*Crim.* 3d § 466 (2005) ("There is only one ground for a motion for a judgment of acquittal"—insufficiency of the evidence).  Consequently, the Court will consider under Rule 29 only Hunt and Smith's allegation that the Government failed to prove their participation in the conspiracy beyond a reasonable doubt.  Their remaining contentions will be evaluated in the context of their motions for a new trial.

> In ruling on a motion for a judgment of acquittal, the Court
>
> must view the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt.  The prosecution need not rebut all reasonable hypotheses other than guilt.  The jury is free to choose between or among the conclusions to be drawn from the evidence presented at trial, and the district court must accept all reasonable inferences and credibility determinations made by the jury.

*Miranda*, 2005 WL 2217071 at *4.

Hunt and Smith argue that the Government failed to carry its burden of proof on the conspiracy charge.  With respect to that burden, the Eleventh Circuit in *Miranda* noted that:

> to prove participation in a conspiracy, the government must have proven beyond a reasonable doubt, even if only by circumstantial evidence, that a conspiracy existed and that the defendant knowingly and voluntarily joined the conspiracy.  To satisfy this burden, the government need not prove that the defendant[ ] knew of all the detail[s] or participated in every aspect of the conspiracy.  Rather, the

government must only prove that the defendant[ ] knew the essential nature of the conspiracy. Whether [the defendant] knowingly volunteered to join the conspiracy may be proven by direct of circumstantial evidence, including references from the conduct of the alleged participants or from circumstantial evidence of a scheme. Although mere presence at the scene of a crime is insufficient to support a conspiracy conviction, presence nonetheless is a probative factor which the jury may consider in determining whether a defendant was a knowing and intentional participant in a criminal scheme. . . . [W]here large quantities of drugs are present a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders.

*Id.* (citations and quotation marks omitted) (alterations in original).

Hunt and Smith assert that the evidence was insufficient for three reasons: (1) Dean's credibility was so undermined and his testimony so thoroughly impeached that the jury should have disregarded it in its entirety; (2) law enforcement officers did not recover the jack during the post-arrest search of Dean's residence; and (3) neither Hunt's nor Smith's fingerprints were found on the cut up plastic sandwich bags used to package the cocaine.

To the extent that Dean's believability (or lack thereof) is the basis for a new trial, the Court declines to substitute its own credibility determinations in place of those made by the jury. The fact that Dean is a convicted drug dealer and an indicted co-conspirator does not render the Court free to conclude that the jurors erred in finding Dean's account of the events of April 8 believable. After all, it is

squarely within the province of the jury, as the fact-finding body, to credit or discredit a witness's testimony.   As discussed below in the context of the defendants' motions for a new trial, Dean's testimony is not incredible on its face, and the Court rejects any contention that his testimony was insufficient to sustain the conviction merely because of his prior criminal history.

At trial, Dean testified that he solicited Hunt and Smith to help him repair his front door and to help him re-rock the cocaine because he was unable to do so by himself.   He testified that Smith cut up the plastic sandwich bags in order to make them a suitable size and shape for carrying one ounce of cocaine.   Dean testified that Hunt and Smith knew he was preparing the cocaine for sale to a customer.   Both Hunt and Smith rode with Dean to Buffalo's to make the delivery to the cooperating witness.   At the time of the arrest, Dean, Hunt, and Smith were asked to get out of the car, and nine one-ounce bags of cocaine fell out of Dean's lap onto the ground.   When officers looked into the backseat where Hunt was sitting, they found approximately one gram of cocaine on the floor and eleven more bags of cocaine shoved into a Gunk can (which had a false bottom) located under one of the seats.   From Dean's testimony, and from the testimony of the officers who were present at the scene of the arrest, the jury could have concluded

11

beyond a reasonable doubt that both Hunt and Smith "knew the essential nature of the conspiracy." *Miranda* at *4. Though presence at the scene of a crime is not in itself sufficient to convict a person of participating in the crime, it is a probative piece of circumstantial evidence from which a reasonable juror may legitimately infer that the person was a knowing and voluntary part of the criminal enterprise. *Id.* As the court in *Miranda* recently reiterated, "where large quantities of drugs are present 'a prudent smuggler is not likely to suffer the presence of unaffiliated bystanders.'" *Id.* (quoting *United States v. Cruz-Valdez*, 773 F.2d 1541, 1547 (11th Cir. 1985)). The Court finds that the evidence produced at trial was sufficient to support the conspiracy convictions of Hunt and Smith beyond a reasonable doubt.

Hunt and Smith also argue that the evidence is insufficient to sustain their convictions because the jack was not recovered and because their fingerprints were not found on the plastic bags. The absence of this sort of tangible evidence in a conspiracy case, however, does not render insufficient otherwise competent direct and circumstantial evidence of a conspirator's guilt. If the jury believed Dean's testimony, which presumably it did, that testimony, coupled with the permissibly drawn circumstantial inferences flowing from Hunt and Smith's presence in a car

full of cocaine, provided ample evidence—even without the jack and the fingerprints—to convict them of participating in the conspiracy beyond a reasonable doubt.

Accordingly, their motions for a judgment of acquittal are **DENIED.**

## B.    Motion for New Trial

The Court's consideration of a motion for a new trial is governed by Rule 33 of the Federal Rules of Criminal Procedure.  Under that Rule, the Court may grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33 (West 2005). Where the motion is filed within seven days after the jury verdict is returned, "a court has very broad discretion in deciding whether there has been a miscarriage of justice." *United States v. Schlei*, 122 F.3d 944, 990-91 (11th Cir. 1997).  Smith and Hunt filed their new-trial motions on April 27 and April 28, respectively—within seven days after the jury rendered its verdict on April 21. Therefore, the Court has significant discretion to determine whether justice requires vacating the jury verdict and ordering a new trial.  In total, Hunt and Smith assert five arguments in support of their new-trial motions.  Together they argue that: (1) the evidence was insufficient to support the convictions; (2) an erroneous evidentiary ruling by the Court prevented them from successfully impeaching

Dean's testimony; (3) Dean's testimony was so impeached that it could not reasonably have provided a basis for their convictions; and (4) the prosecutor improperly commented during closing arguments on their failure to testify at trial. Additionally, Hunt argues that (5) the prosecutor violated his Due Process rights by commenting during closing arguments on his post-arrest, post-Miranda silence. The Court will address each argument in turn.

### 1.     Insufficient Evidence of Conspiracy

Though not constrained by Rule 33 to view the evidence in the light most favorable to the Government, *see **United States v. Brennan***, 326 F.3d 176, 189 (3d Cir. 2003) (citing ***United States v. Lacey***, 219 F.3d 779, 783-84 (8th Cir. 2000) and ***United States v. Ashworth***, 836 F.2d 260, 266 (6th Cir. 1988)), the Court nevertheless remains mindful of the importance of respecting the crucial role played by the jury in our legal system.  The Court is therefore reluctant to exercise its discretion in favor of circumventing the jury's assessment of the evidence or second-guessing its conclusions.  "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." ***United States v. Santos***, 20 F.3d 280, 285 (7th Cir. 1994) (citation omitted). "A district court can order a new trial on the ground that the jury's verdict is

contrary to the weight of evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Brennan*, 326 F.3d at 189. For the same reasons stated above in the context of Rule 29, and after a thorough review of the evidence produced at trial, the Court finds that the jury's verdict is supported by sufficient evidence and that the Government therefore carried its burden of proving the defendants' guilt beyond a reasonable doubt.

### 2.    Improper Evidentiary Ruling

Hunt and Smith argue that the Court erred when it prevented them from attempting to impeach Dean's trial testimony by questioning Investigators Matthews and Patterson about prior inconsistent statements Dean made to them after his arrest. In support of their contention, they cite *United States v. Billue*, 994 F.2d 1562 (11th Cir. 1993). A close reading of *Billue* reveals that it has no application to the facts of this case.

Dean testified on direct examination that he sat alone at his kitchen table using a flour sifter to mix the cocaine together with 250 grams of Mannitol while Hunt and Smith were repairing the front door. (Tr. II, 92:19 to 93:13). He further testified that Smith—not Hunt—cut up the plastic bags used to package the cocaine for distribution to the cooperating witness. (Tr. II, 121:22-24).

15

On cross-examination, however, Hunt's attorney was able to elicit certain inconsistencies between Dean's prior statements and his courtroom testimony. For example, Dean admitted telling Matthews and Patterson after his arrest that Smith had used a heavy mixer to mix the cocaine and mannitol. (Tr. II, 120:23 to 121:4). He also acknowledged stipulating in his plea agreement to the fact that both "Derrick Dujuana Hunt and Antonio Sherard Smith took the cocaine and mixed the cocaine with a cutting agent known as mannitol." (Tr. II, 120:1-8). Dean further conceded that the stipulated facts in his plea agreement implicated both Smith and Hunt in the cutting of the plastic bags, whereas he testified at trial that only Smith cut up the bags. (Tr. II, 121:13-22).

After exposing Dean's inconsistent statements, the defense sought to impeach Dean's testimony further by calling Investigators Matthews and Patterson to the stand to question them about Dean's prior statements and to introduce into evidence written summaries of their interview with Dean. The Government objected to the defense's attempt to call Matthews and Patterson, arguing that because Dean had already admitted to, and been questioned about, the inconsistencies on the stand, permitting the investigators to testify on the same issue would be duplicative and irrelevant and would amount to an inappropriate

impeachment device under the rules of evidence.  As the Government noted outside the presence of the jury, "the inconsistencies are already out there." (Tr. II, 131:7).  The Court sustained the Government's objection and did not allow the defense to question Matthews and Patterson about Dean's prior statements.

Hunt and Smith argue in their briefs that the Court erred under ***Billue*** by excluding the Investigators' testimony.  In ***Billue*** the court upheld the introduction of impeachment testimony by an ATF Agent where the witness sought to be impeached testified that he could not remember a statement he had purportedly given to the Agent.  994 F.2d at 1565.  The government called the Agent to the stand to question him about the statement.  The defense objected to the questioning of the Agent on the grounds that his testimony could not be admitted for impeachment purposes because the witness had not denied making the statement.  On appeal, the court disagreed, holding that the witness's failure to remember the statement in question was equivalent to his having denied making the statement and was therefore subject to impeachment by the ATF Agent's testimony.  ***Id.***  The court stated that "[t]he law is clear that if a witness has *denied* making a statement *or has failed to remember it*, the making of the statement may be proved by another witness."  ***Id.***

The problem with the defendants' reliance on **_Billue_** and the principle of law for which it stands is that Dean never denied making a prior inconsistent statement to the investigators.  Nor did he testify that he could not remember making a specific statement to them.  Rather, he fully conceded on the witness stand that several of his prior statements to the investigators differed from what he testified to at trial.  After defense counsel succeeded in drawing these inconsistencies out of Dean, there was nothing further to impeach, and the testimony of the investigators would have added nothing to the evidence already before the jury. The inconsistencies were, in the Government's words, "already out there." Accordingly, the Court did not err in excluding the Investigators' additional testimony regarding Dean's prior statements.

### 3.   Dean's Credibility

Smith and Hunt insist that Dean's credibility was so severely compromised as a result of his desire to gain beneficial treatment from the Government that the jury erred in relying on his testimony for any purpose.  They also contend that Dean's testimony was thoroughly impeached during the trial; so much so that it cannot support a finding of guilt beyond a reasonable doubt.  Because the Government's case was built primarily on Dean's testimony, the defendants argue that they are entitled to a new trial in the interest of justice.

Questions concerning witness credibility are, except under the most extreme circumstances, properly reserved for the jury. In a conspiracy case, "uncorroborated testimony of an accomplice may be enough to support a conviction if the testimony is not on its face incredible or otherwise insubstantial." **United States v. Garcia**, 405 F.3d 1260, 1270 (11th Cir. 2005). Testimony is considered incredible if it is "unbelievable on its face, *i.e.*, testimony as to facts that [the witness] physically could not have possibly observed or events that could not have occurred under the laws of nature." **United States v. Rivera**, 775 F.2d 1559, 1561 (11th Cir. 1985) (citations and internal quotation marks omitted). Testimony does not become incredible merely because the witness "has consistently lied in the past, engaged in various criminal activities, thought his testimony would benefit him, [or] showed elements of mental instability." **Id.** A jury verdict need not be set aside simply because the Government chooses to prove its case using the testimony of "scoundrels, liars and brigands." **Id.**

Dean's motive for testifying and any inconsistencies between his prior statements and his trial testimony are factors the jury was free to consider, and likely did consider, in appraising his credibility. The jury found Dean to be believable, and the Court will not now disturb that finding, as it is apparent from

the record that his testimony is not incredible on its face.  Accordingly, the defendants' argument that a new trial is warranted on this basis must fail.

### 4.    Comments on Hunt and Smith's Failure to Testify

Hunt and Smith argue that they are entitled to a new trial in the interest of justice because the prosecutor made statements during closing arguments that violated their constitutional right not to testify under the Fifth Amendment.  They maintain that these statements improperly invited the jurors to consider their silence at trial as substantive evidence of their guilt.

"The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify."  ***United States v. Muscatell***, 42 F.3d 627, 632 (11th Cir. 1995) (citing ***Griffin v. California***, 380 U.S. 609, 615 (1965)).  In considering whether a prosecutor has impermissibly commented on a defendant's failure to testify, the Court must ask "whether [or not] the statement was manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."  ***United States v. Watson***, 866 F.2d 381, 386 (11th Cir. 1989) (internal quotation marks and citations omitted).  The Court is not persuaded—nor has the defense argued—that the prosecutor in this case manifestly intended to highlight to the

jurors the defendants' decision not to testify.[5]   Therefore, the Court is concerned solely with whether the challenged remark would have been construed by the jurors as a comment on the defendants' silence at trial.  In this regard, "[t]he question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury *necessarily* would have done so."  **Isaacs v. Head**, 300 F.3d 1232, 1270 (11th Cir. 2002).  The remark must be viewed in context, and the defendant has the burden of proving the existence of one of the two criteria listed above.  *See* **Muscatell**, 42 F.3d at 632.

Importantly, however, in order to pose a Fifth Amendment problem, the challenged comment or comments must have been a reference to the defendant's failure to testify, not merely a general statement about the failure of the defense to rebut the Government's evidence.  As the Eleventh Circuit has held, "[a] comment on the failure of the defense, as opposed to the defendant, to counter or explain the testimony presented or evidence introduced does not violate the defendant's fifth amendment right not to testify."  **United States v. Watson**,

---

[5] The Court would like to be abundantly clear on this point: The prosecutor involved in this case has appeared before the undersigned on dozens, if not hundreds, of occasions during the past 20 years.  Not one time has the Court suspected—and it does not now suggest—that he would intentionally engage in unprofessional conduct or in any manner willingly disregard the important constitutional rights of an accused defendant.

866 F.2d 381, 386 (11th Cir. 1989) (citing **United States v. Dearden**, 546 F.2d

622, 625 (5th Cir. 1977)).

In arguing the Government's case to the jury, the prosecutor made the

following statement: **"Mr. Dean's testimony is completely unrebutted."**

(Tr. II, 198:3)  Hunt and Smith argue that this statement necessarily constituted a

comment on their failure to testify because they were the only two possible

individuals who could have "rebutted" Dean's testimony.  They point out that

there were no other witnesses to the alleged criminal conduct and no other

physical evidence the defense could have introduced to counter Dean's version of

events.

The Government, on the other hand, insists that this statement refers merely

to the defense's failure to offer a plausible alternative explanation to undermine the

version of events Dean testified to.  The Government argues that a reasonable

juror, viewing the statement in light of the entire closing argument, would have

understood the statement as simply pointing out the weakness of the defense's

case.  The Court cannot agree with the Government's assessment.

Where the defendant himself (or his co-defendant) is the only person who

can contradict or rebut the testimony of a Government witness, any assertion by

the prosecutor that such testimony has not been contradicted or rebutted constitutes an indirect comment on the defendant's failure to testify in violation of the Fifth Amendment.  The caselaw overwhelmingly recognizes and supports this proposition.  *See* **United States v. Flannery**, 451 F.2d 880, 881-82 (1st Cir. 1971) ("for the government to say, in summation to the jury, that certain of its evidence was 'uncontradicted,' when contradiction would have required the defendant to take the stand, drew attention to his failure to do so, and hence was unconstitutional comment."); *see also* **United States v. Lipton**, 467 F.2d 1161, 1168 (2d Cir. 1972) (recognizing an exception to the general rule that the prosecutor may comment upon the defense's failure to contradict the government's evidence "where . . . the defendant alone has the information to contradict the government's case."); **United States v. Venable**, 443 F. Supp. 178, 181 (E.D. Pa. 1977); **United States v. Jennings**, 527 F.2d 862, 871 (5th Cir. 1976) (noting that it is permissible to "point out that the testimony of witnesses is uncontradicted . . . where someone other than the defendant could have offered contrary evidence."); **Lent v. Wells**, 861 F.2d 972, 976 (6th Cir. 1988) ("If evidence that the prosecutor labels as uncontradicted could only have been contradicted by the defendant's testimony, that label is much more objectionable."); **United States v. Cotnam**, 88 F.3d 487,

497 (7th Cir. 1996) ("A prosecutor's comment that the government's evidence on an issue is 'uncontradicted,' 'undenied,' 'unrebutted,' 'undisputed,' etc., will be a violation of the defendant's Fifth Amendment rights if the only person who could have contradicted, denied, rebutted or disputed the government's evidence was the defendant himself."); ***Sidebottom v. Delo***, 46 F.3d 744, 759 (8th Cir. 1995) ("The prosecution may comment on the defense's failure to present evidence to contradict the [government's] case 'unless the defendant alone had the information to do so.'"); ***Leathers v. United States***, 250 F.2d 159, 166 (9th Cir. 1957) ("[A]side from those special cases where it appears that the accused himself is the only one who could possibly contradict the Government's testimony, the prosecutor may properly call attention to the fact that the testimony of the Government witnesses has not been contradicted."); ***United States v. Barton***, 731 F.2d 669, 674 (10th Cir. 1984) (Where "remarks [by the prosecutor] concern matters that could have been explained only by the accused, the remarks give rise to an innuendo that the matters were not explained because [the defendant] did not testify.")

In this case, it is plainly apparent to the Court that Hunt and Smith were the *only* two people in the universe of potential witnesses that could have possibly

possessed information to "rebut" the testimony of Dean. At every critical period during the day of April 8, 2004, there were no other individuals present alongside Hunt, Smith, and Dean. The carrying out of the conspiracy took place largely inside Dean's home and his car. There was no evidence at trial to indicate that any conversation or conduct related to the conspiracy took place in the vicinity of any other person.

The Court acts with reluctance when called upon to construe a prosecutor's remark regarding "unrebutted" testimony as necessarily drawing the jury's attention to the defendant's failure to testify, and it will not do so where there is some other explanation for the remark that is equally plausible. Here, there is no such equally plausible explanation. The Government argues that the comment about Dean's unrebutted testimony was intended merely to point out to the jury that there was no dispute as to the validity and authenticity of the physical evidence against Hunt and Smith. For instance, the Government notes that the defense did not dispute that the substance seized from Dean's car and home was in fact cocaine; that the plastic bags introduced at trial were the ones seized on the day in question; or that the quantity of cocaine seized was sufficient to support an inference that the defendants intended to distribute it. However, those pieces of evidence

were neither introduced nor validated by Dean's testimony but, rather, by other Government witnesses, including a police investigator and a forensic analyst. Therefore, the Government's suggestion that the comment about Dean's unrebutted testimony was in reality a comment on the defense's failure to challenge or undermine the legitimacy of the Government's physical evidence is simply not plausible.  Instead, viewing the comment in its proper context demonstrates that what remained unrebutted by the defense was Dean's account of his own activities and the activities of Hunt and Smith on April 8.  Any such rebuttal would have required calling Hunt and Smith to the stand to challenge Dean's allegations.

Because the jury was aware that only Hunt or Smith could have refuted or rebutted Dean's story, the Court concludes that the jurors would necessarily have found the comment in question to be a remark on their failure to testify at trial. As discussed below, however, this conclusion does not automatically require that the defendants receive a new trial.

### 5.   Comments on Hunt's Post-Arrest, Post-Miranda Silence

Hunt maintains that the interest of justice requires a new trial because the prosecutor inappropriately commented during closing arguments on his post-arrest silence while being questioned by Investigator Matthews.  Hunt argues that

the prosecutor's comments violated his Due Process rights.  Specifically, Hunt

finds error in the following statements:

> Remember when Mr. Fox [Hunt's attorney] spoke or asked questions of Investigator Matthews [on cross-examination during the Government's case-in-chief]?  And he asked him some questions about what Mr. Hunt said when he got out of the vehicle.  Remember that exchange of questions?  And he asked him did he say anything incriminatory.  And what was his response?  "No, he didn't."  Then I came back and asked another question, "Well, did he say anything exculpatory?  Did he ever deny that it [the cocaine] was his?"  And what was the answer to that question?  "No."  **Again, common sense—common sense would tell you that when people are being arrested, if it's not yours, what's the very numero uno, number one, thing you're going to say?  "It's not mine."**

(Tr. II, 220:1-14) (emphasis added).

Generally, a prosecutor may not comment on a defendant's post-arrest, post-

Miranda silence for impeachment purposes or to create an inference of guilt

without violating the guarantee of fundamental fairness embodied in the Due

Process Clause.  *See* **Doyle v. Ohio**, 426 U.S. 610 (1976); *see also* **Sullivan v.**

**Alabama**, 666 F.2d 478, 484 (11th Cir. 1982).  But there are certain circumstances

under which such comments may be permissible.  For example, the Supreme Court

has articulated an exception to the rule set forth in **Doyle**, whereby a prosecutor

may comment on the defendant's silence so long as the comment is merely a

"fair response" to an argument by defense counsel based on the defendant's

silence. *See **United States v. Robinson***, 485 U.S. 25, 34 (1988). The Government asserts that the statements set forth above are unobjectionable under this exception because Hunt's attorney first opened the door by eliciting on cross-examination the fact that Hunt did not incriminate himself at the time of the arrest. Thus, the Government argues, any comment on Hunt's post-arrest silence was thereafter fair game in its closing argument. The Court agrees with the Government's characterization only up to a point.

In the initial portions of the above-quoted remarks, it is evident that the prosecutor was legitimately responding to a specific line of questioning pursued by Hunt's attorney during his cross-examination of Investigator Matthews. On cross-examination, Hunt's attorney had asked Investigator Matthews whether Hunt made any incriminating statements after he was arrested and read his Miranda rights. Investigator Matthews responded that he had not. Before proceeding with his re-direct of Matthews, the prosecutor, treading cautiously, requested a side bar for the purpose of asking the Court's permission to question Matthews about whether Hunt had made any exculpatory statements after being arrested. In proposing this question, the prosecutor was attempting to negate the implication created by Matthews's testimony that Hunt had said nothing at the scene to incriminate himself.

The Court permitted the question as to Hunt, but not Smith, as Smith's attorney had not asked Matthews any questions concerning Smith's post-arrest behavior.  Following the side bar, the prosecutor proceeded to ask Matthews whether Hunt made any exculpatory comments after being arrested.  Matthews responded that he had not.  During closing arguments, the prosecutor revisited this issue by reminding the jury that Hunt did not make any statement at all after his arrest—either inculpatory or exculpatory.  There is nothing objectionable about the prosecutor's having brought this fact to the jury's attention during its closing argument, and Hunt has rightly chosen not to challenge this portion of the prosecutor's remarks.  The Supreme Court's holding in **Robinson** makes clear that a prosecutor is entitled to respond to a defense attorney's questioning in this manner.  Indeed, as the Court noted there, "it is one thing to hold, as we did in **Griffin**, that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt, it is quite another to urge . . . that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence."  485 U.S. at 34.

It is the bold portion of the above-quoted remarks that Hunt—and the Court—finds most troubling.  After fairly responding to the defense's questioning of Matthews, the prosecutor inexplicably commented further, playing to the jury's

common-sense perception that innocent people do not stand mute when being accused of violating the law.   By effectively asking the jury to draw an impermissible inference of guilt based on Hunt's post-arrest, post-Miranda silence, the comment transgresses the "fair response" boundary laid down in **Robinson** and, in so doing, runs afoul of the Constitution under **Doyle**.  *See* **Sullivan**, 666 F.2d at 484 (recognizing that the Due Process Clause prohibits any "comment or reference to a defendant's silence as evidence of guilt"); *see also* **United States v. Rosenthal**, 793 F.2d 1214, 1243 (11th Cir. 1986) (noting that "virtually any description of a defendant's silence following arrest and a *Miranda* warning will constitute a **Doyle** violation.").

Necessarily implicit in the sort of "fair response" contemplated by **Robinson** is a sense of balance and proportion vis-à-vis the defendant's original argument.  The Supreme Court's willingness in **Robinson** to afford the prosecutor some measure of leeway when confronted with a defendant's argument based on his own silence cannot be interpreted as granting the Government carte blanche to make a blanket statement like the one emphasized above.  Here, the prosecutor's statement does not purport to be in response to Hunt's attorney's original questioning regarding the fact that Hunt did not incriminate himself at the scene.

And neither is it restricted solely to Hunt.  Instead, the statement focuses the jury's attention on the natural inclination of all innocent "people"[6] to proclaim their innocence when faced with accusations of criminal conduct.  It is a broad appeal to common sense, an appeal which the Constitution forbids and which does not appear to bear any reasonable relation to the prior argument of Hunt's attorney.  Reminding the jurors that Hunt remained silent in the face of Matthews's questioning was appropriate under the circumstances.  Telling them that an innocent person would have spoken up was not.  Nevertheless, a finding of constitutional error does not automatically entitle the defendants to a new trial.

### 6.  Harmless Error

The Court has identified two discrete constitutional errors, both of which have been characterized as "trial error" and, as such, are subject to harmless-error review.  *See* **Chapman v. California**, 386 U.S. 18, 22 (1967) (comment on failure

---

[6] Although not raised in Smith's brief supporting his motion for a new trial, the Court treats the comment addressed in this section as constituting prejudicial error with respect to both defendants.  To do otherwise would be to countenance an anomalous and unjust result.  As noted, the prosecutor's remarks were made to the jury in a portion of the closing argument which focused primarily on Hunt's post-arrest behavior.  However, because the problematic comment did not specifically single out Hunt, the Court is compelled to conclude that it prejudiced both defendants equally.  This conclusion is especially warranted for two additional reasons: first, as far as the jurors knew, Smith never denied to law enforcement officials that the drugs were his and, second, both Hunt and Smith were convicted of the same offenses on essentially the same evidence.

to testify); *see also* **Brecht v. Abramson**, 507 U.S. 619, 629 (1993) (comment on post-arrest, post-Miranda silence); *see also* **United States v. Gonzalez**, 921 F.2d 1530, 1549 (11th Cir. 1991) (same).  Under the harmless-error standard, an error of constitutional magnitude does not require that a conviction be set aside automatically.  Rather, a conviction will be sustained where the Court is "able to declare a belief that [the error] was harmless beyond a reasonable doubt." **Chapman**, 386 U.S. at 24.  To determine if an error was harmless beyond a reasonable doubt, courts must "'examin[e] [ ] the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of the defendant's guilt.'" **Gonzalez**, 921 F.2d at 1549 (quoting **United States v. Pena**, 897 F.2d 1075, 1082 (11th Cir. 1990)).

References of the sort identified here, when made in relative isolation, are typically considered harmless beyond a reasonable doubt where the evidence of the defendant's guilt is otherwise overwhelming.  *See* **United States v. Miller**, 255 F.3d 1282, 1285-86 (11th Cir. 2001).  The evidence against Hunt and Smith adduced by the Government at trial, while sufficient to sustain their convictions beyond a reasonable doubt, was not, in the Court's estimation, overwhelming.  The evidence against them was limited to Dean's testimony and to the circumstantial

inferences to be drawn from Hunt's and Smith's presence in a vehicle containing a large amount of drugs.  Dean's testimony was not corroborated by anyone else, and there was no other physical evidence linking them to the conspiracy.  There were no identifiable fingerprints found on the plastic bags used to package the drugs, and the jack ostensibly used to re-rock the cocaine was never recovered in the subsequent search of Dean's home.  Of course, these pieces of evidence were not necessary to establish the essential elements of the crimes, but their absence does tend to reduce the overall strength of the Government's case.

In sum, the Court fully recognizes that the essence of a conspiracy is a mere agreement to break the law and that agreements of that kind are not generally reduced to writing.  As a result, it is often the case that there is no hard evidence linking accused conspirators to the crimes for which they are charged.  Even taking these truths into consideration, however, the evidence in this case was relatively slim.  The Court, therefore, cannot say that the case against Hunt and Smith was so overwhelming as to make the prejudicial comments discussed above harmless beyond a reasonable doubt.

## III.   CONCLUSION

The Court hereby concludes as follows:

1.   Defendants' motions for a judgment of acquittal (docs 77 & 79) are **DENIED.**

2.   Defendants' motions for a  new trial (docs 76 & 78) are **GRANTED.**

3.   Smith's motion for release from custody pending sentencing (doc 93) is **MOOT.**

The Court will schedule a new trial in this matter at the earliest practicable date, and the parties will be notified accordingly.  In the meantime, this matter is recommitted to the United States Magistrate Judge for a determination under 18 U.S.C.A. § 3142.

SO ORDERED, this 3rd day of November, 2005.

**/s/ Duross Fitzpatrick**
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/sew